```
-----------------------------x
                             :
KATHLEEN RUGGERIO,           :
                             :
           Plaintiff,        :
                             :
v.                           :   Civil No. 3:11CV760(AWT)
                             :
HARLEYSVILLE PREFERRED       :
INSURANCE COMPANY,           :
                             :
           Defendant.        :
                             :
-----------------------------x
```

## MEMORANDUM OF DECISION

Plaintiff Kathleen Ruggerio brings two claims against defendant Harleysville Preferred Insurance Company. The Amended Complaint sets forth a claim for simple negligence (First Count) and a claim breach of an insurance contract (Second Count). At the final pretrial conference, the plaintiff sought permission to file a second amended complaint adding claims for negligent and intentional infliction of emotional distress and breach of the duty of good faith and fair dealing, in anticipation of evidence she expected to introduce at trial. The court decided that it would address that request in its decision after trial, so that it could take into account the evidence introduced at trial. For the reasons that follow, the plaintiff's request to add the additional claims is being denied and the court finds for the defendant on both the First and Second Counts.

## I. FACTS

Plaintiff Kathleen Ruggerio ("Ruggerio") was at all relevant times the owner of 52 Airline Road, Clinton, Connecticut (the "Property"). On and prior to April 20, 2010, Ruggerio had a contract for insurance with defendant Harleysville Preferred Insurance Company ("Harleysville") under which the Property was covered (the "Policy"). The Policy was in full force and effect on April 20, 2010.

On April 20, 2010, the Property was severely damaged by fire. The Clinton Fire Marshall, together with Sgt. Jeremiah Dunn and Detective John Sawyer of the Clinton Police Department, conducted an investigation into the origin and cause of the fire. They concluded that there were multiple points of origin and that the cause was arson.

Sgt. Joseph Flynn also reported to the scene of the fire on April 20. The plaintiff arrived on the scene after being advised of the fire by Flynn. Sgt. Flynn and Sgt. Dunn interviewed the plaintiff on April 21st. She told them that she did not know who started the fire and that the last time she had been at the Property was the week prior to the fire. She mentioned that at that time she observed that a washer, a dryer and a generator had been taken. She also advised the officers that she had checked with all of her adult children and confirmed that none of them had taken these items.

Bryan Taylor, an adjuster for Harleysville, was assigned to work on the plaintiff's claim on April 22, 2010. He learned on that day that the fire had been set. The next day, Taylor contacted the plaintiff and explained the insurance coverage and the procedures that would be followed. The plaintiff advised him that she had been staying at the Property off and on since September 2009, when her husband died. She also stated that 95% of her clothing was kept at the Property. Taylor concluded that the plaintiff needed an advance for her immediate needs, and he proceeded to make arrangements to have Harleysville advance $5,000 to the plaintiff.

The plaintiff also informed Taylor that when she was at the Property several days prior to the fire, she saw that the rear basement door had been kicked in and a washer, dryer and generator had been taken. She stated that she had not contacted the police because she wanted to first check with her adult children to see if any of them had removed the items, but that she had reported the break-in to the police after she learned of the fire on April 20, 2010. She told Taylor that although she had filed the police report she was not sure she would file a claim for the break-in and theft. Taylor thought the plaintiff appeared to be distraught.

On April 23, Sgt. Flynn determined that a generator had been pawned by the plaintiff's son-in-law, Anthony D'Agostino in

January of 2010; D'Agostino is married to one of Ruggerio's daughters, Kathleen Shirley Ruggerio ("Kat Ruggerio"). When Sgt. Flynn spoke to Anthony D'Agostino about the pawned generator, D'Agostino said it was a different generator than the one that had been reported stolen from the Property.

On April 27, Taylor met with the plaintiff and one of her friends, and he also met with Harleysville's investigator, Dominick Buccafurri. On April 28, Taylor made a note in the claims file that relatives of the plaintiff were persons of interest with respect to the arson but the plaintiff herself was not. Taylor's entry in the claims file on April 28 also reflects his observation that the plaintiff seemed "out of it" and could not concentrate on basic questions. Taylor felt he needed to explain twice to the plaintiff the coverage and the procedures that would be followed and do so in the presence of her friend.

While Taylor was at the Property on April 27, the plaintiff informed Taylor that she would like to also make a claim for the theft of the washer, dryer and generator. She informed Taylor that she had waited until then to report these items missing because she wanted to check with all of her adult children to find out if any of them had removed these items from the Property, as opposed to them being stolen. The plaintiff told Taylor that she had determined that none of her children had

taken these items so she wished to submit a claim with respect
to them.

The plaintiff advised Sgt. Flynn that she had put in a
claim with her insurance company for the damage to the Property
caused by the fire, as well as a claim for the washer, dryer and
generator.  She informed Sgt. Flynn that Harleysville was her
insurance company.  Sgt. Flynn contacted Bryan Taylor at
Harleysville, and on April 27, 2010 Taylor confirmed that the
plaintiff had made a claim for the damage to the house as well
as a claim for the washer, dryer and generator.

Then, on May 1 the plaintiff sent an e-mail to Taylor
informing him that there was no need to file a claim for the
washer, dryer and generator because she had found out what
happened to those items and they had not been stolen.

On May 5, Sgt. Flynn spoke again with Anthony D'Agostino
after confirming that the generator sold at the pawn shop
matched the description of the one that had been stolen from the
Property.  D'Agostino admitted that he had taken the items from
the Property but stated that he had been given permission by the
plaintiff to take them.  He said he, his wife Kat and the
plaintiff had lied to the police about Anthony D'Agostino taking
the items because the items had been promised to another family
member.  After speaking with Anthony D'Agostino, Sgt. Flynn
contacted the plaintiff, who told him that she was aware that

D'Agostino and her daughter Kat had taken the washer, dryer and generator. She indicated to Flynn that she had given them permission to take these items but did not want her son, Kenneth Ruggerio, Jr., to know. Sgt. Flynn asked the plaintiff to provide a written statement, and she did so. Sgt. Flynn concluded that the written statement differed from what the plaintiff had told him over the telephone.

Subsequently, during her Examination Under Oath on March 2, 2011, the plaintiff would testify that Anthony D'Agostino did not have permission to take the appliances. She testified that she learned that he had taken them after she had already signed a statement saying that the appliances had been stolen. She further testified that she went to the Clinton Police Department and changed her statement because she did not want her daughter Kat to get in trouble for something her husband Anthony D'Agostino had done.

On May 18, 2010, the Clinton Police Department received a tip from an anonymous caller. The caller reported that the plaintiff had arranged for the arson at the Property and had set up the arson so that she could collect the insurance money.

On May 19, 2010, Sgt. Flynn contacted Buccafurri to advise him about the anonymous tip.

On May 19, 2010, Sgt. Flynn spoke by telephone with Susan D'Agostino, who is the mother of Anthony D'Agostino and the

mother-in-law of Kat Ruggerio.  (Sgt. Flynn's affidavit in
support of the application for the arrest warrant gives her last
name as "Esposito".)  Susan D'Agostino acknowledged to Flynn
that she was the person who had called the tip line on May 18.
D'Agostino told Flynn that on or about March 21, 2010 she and
the plaintiff had had a conversation during which the plaintiff
told her that she wanted to burn down the Property and collect
the insurance money.  D'Agostino told Flynn that the
conversation had been witnessed by five other people.
D'Agostino said that the plaintiff offered to pay two of those
people $10,000 to burn the Property.  Sgt. Flynn re-interviewed
Susan D'Agostino in person on May 24, 2010 and Susan D'Agostino
repeated the same information.  She also identified the other
people who were present.

On May 24, 2010, Sgt. Flynn spoke with four of the five
witnesses who had been identified by D'Agostino.  William
Grecco, the boyfriend of Susan D'Agostino's daughter, stated
that he recalled the plaintiff talking about burning her house
and that the plaintiff had offered to pay him $10,000 to burn
the Property but Grecco had walked away and had not talked to
her since.  Sgt. Flynn also interviewed Kat Ruggerio, the
plaintiff's daughter, who said that she recalled her mother
discussing burning the house and making the statement to Grecco
about paying him $10,000 to burn it.  Kat Ruggerio told Flynn

that she took the statements seriously because her mother hated the house.  But Kat Ruggerio testified subsequently that she only made those statement to Sgt. Flynn because Susan D'Agostino had threatened her.  She also testified subsequently that she had informed Flynn of the fact that Susan D'Agostino had gotten her to make the statement to Flynn by threatening her, but that was contrary to her deposition testimony.

Sgt. Flynn also interviewed Pasquale D'Agostino, the 15-year-old son of Susan D'Agostino.  He also stated that the plaintiff had told him that she would pay him $10,000 to burn the house.  Finally, Sgt Flynn interviewed Sandra Capriglione, the mother of Susan D'Agostino.  Capriglione stated that the plaintiff was complaining that the Property would cost too much to fix up and sell, so she wanted it to burn.  Capriglione stated that she heard the plaintiff tell Pasquale D'Agostino that she would pay him $10,000 if he burned the house. Capriglione also told Flynn that the plaintiff had said the same thing to Grecco.

On May 25, 2010, Sgt. Flynn would speak to Angel D'Agostino by telephone and she would state that she had heard the plaintiff say she wanted to burn the house and heard her offer Pasquale D'Agostino $10,000 to burn the Property.

Susan D'Agostino would testify subsequently, at her deposition, that she was not the person who made the anonymous

telephone call and that she did not tell Sgt. Flynn that she
had; Kat Ruggerio testified though that she saw Susan D'Agostino
make the call.  D'Agostino also testified at her deposition that
police officers showed up at her house to arrest Anthony
D'Agostino and Kat Ruggerio for stealing a washing machine, and
she learned from the officers that the plaintiff had told them
that whoever stole the washing machine had set the fire at the
Property; thus Susan D'Agostino may have acted out of a desire
to protect her son.  In addition, Susan D'Agostino testified at
her deposition that she witnessed the plaintiff authorize Kat
Ruggerio to take the washer and dryer and sell them, and that
she did so before Anthony D'Agostino removed them from the
Property.

On May 24, 2010 Sgt. Flynn re-interviewed the plaintiff.
At that time the plaintiff stated that she never made any
statements about wanting to burn her house and that Susan
D'Agostino had fabricated the incident.  While the plaintiff
acknowledged that she may have made statements to the effect
that she wanted the house gone because it needed repairs, she
told Sgt. Flynn that she had never asked anyone to burn it.

On June 8, 2010, Buccafurri called Sgt. Flynn to inquire
about the status of the investigation.  Flynn told him about the
information that he had obtained by means of interviewing Susan
D'Agostino and the people identified as witnesses by her.

Also on June 8, 2010, Harleysville wrote to the plaintiff advising her that it was reserving its rights under the Policy to disclaim liability and/or deny coverage. Harleysville advised the plaintiff that it was continuing to evaluate and investigate her claim and that as part of its investigation it was asking the plaintiff to furnish Harleysville with 27 categories of records and documents. It requested that this material be provided within 30 days.

On July 1, 2010, counsel for Harleysville wrote to the plaintiff advising her that he wished to schedule her Examination Under Oath and that he would do so as soon as he received the documents and records that had previously been requested. On July 15, 2010 and again on July 28, counsel for Harleysville wrote to the plaintiff reminding her that the deadline for providing the documents and records had passed and again requesting that they be provided.

In October, and again in November and January, counsel for Harleysville contacted the plaintiff's counsel to attempt to schedule the Examination Under Oath. And again in February 2011, counsel for Harleysville reminded the plaintiff's counsel that certain documents and records that had been requested remained outstanding.

In January 2011, Buccafurri was conducting an investigation into the plaintiff's relationships with Jeanne Pierpaoli and

funds the plaintiff received from her during the month of the fire.  He had learned from the plaintiff's bank account records that checks written by Pierpaoli had been deposited into the plaintiff's bank account and the funds had been withdrawn by the plaintiff.  Buccafurri was suspicious because the amounts of the transactions were consistent with an effort to circumvent the currency transaction reporting requirements.  When Pierpaoli was subsequently deposed, which was after Harlesyville had denied coverage, Pierpaoli said that she did not really know Ruggerio, but that Ruggerio was the wife of someone who knew someone in the Peirpaoli family; this was consistent with the testimony of Ruggerio and her second husband, Frank Ruggerio, as to how Ruggerio knew Pierpaoli.  However, after giving that bit of testimony, Pierpaoli asserted the Fifth Amendment privilege with respect to every question of substance concerning the movement of funds from her into the plaintiff's bank account.

The Examination Under Oath finally took place on March 2, 2011.  At that time the plaintiff had not produced all of the requested records and documents.  Although the Examination Under Oath commenced at 2:18 p.m. and concluded at 6:43 p.m., it had not been completed and the plaintiff's counsel had another appointment.  The Examination Under Oath was adjourned with a stipulation that it would be reconvened.

During the Examination Under Oath, the plaintiff gave a different version of the conversation on or about March 21, 2010, which had occurred at Susan D'Agostino's home. She stated that William Grecco had raised the possibility of burning the house for $10,000 and she said "Oh, poof. That would be the end of my problem. I wouldn't have to worry about anything," (Kathleen Ruggerio 3/2/2011 Examination at p. 126, ll. 1-3) but that she was not serious when she said it. During the Examination Under Oath, the plaintiff described Pierpaoli as a personal friend. The plaintiff was asked about the funds from Pierpaoli that had been deposited into the plaintiff's account. The plaintiff stated that Pierpaoli is a shut-in who deposits checks into the plaintiff's account, and the plaintiff then withdraws cash and gives it to Pierpaoli to purchase necessary items.

On March 26, 2011, the plaintiff was arrested pursuant to a warrant that had been issued on January 5, 2011, based on an arrest warrant application submitted by Sgt. Flynn on January 4, 2011. Buccafurri had been advised by Sgt. Flynn on December 29, 2010 that a warrant would be obtained for the plaintiff's arrest. Then Buccafurri was advised by Sgt. Flynn on January 7, 2011 that the warrant for the plaintiff's arrest had been signed and that the charges were felony larceny, insurance fraud and filing a false report. Sgt. Flynn had advised Buccafurri that

the plaintiff had not been charged with arson and conspiracy because Flynn had not located the individuals with whom the plaintiff may have conspired to burn the Property. Thus, Buccafurri attended the Examination Under Oath on March 2, 2011, knowing that the warrant for the plaintiff's arrest was outstanding.

When the plaintiff was arrested on March 26, 2011, she was charged with criminal attempt to commit larceny in the first degree (a Class B felony) based on causing the Property to be burned in an attempt to collect insurance money; insurance fraud, based on making a false claim to Harleysville that the washer, dryer and generator had been stolen and only withdrawing the claim when the fraud was discovered by the police; and providing a false statement in the second degree, based on making a false statement to the Clinton Police Department.

On June 14, 2011, the plaintiff and her criminal defense attorney talked to the state prosecutor, who advised them that the state had written a letter to Harleysville and was waiting for a response before deciding what type of an offer to make to the plaintiff in terms of disposition of the criminal case.

Following the plaintiff's arrest, there were discussions between counsel for Harleysville and her counsel about resuming the Examination Under Oath. These discussions culminated in the plaintiff's counsel advising counsel for Harleysville in June

2011 that the plaintiff would not provide any further sworn testimony or any additional supporting claim documents until her criminal case had been resolved.  Counsel for Harleysville took the position that the plaintiff did not have the right to refuse to continue the Examination Under Oath.  The plaintiff's counsel sought a continuance to late August or early September so that research on the issue could be conducted.

Eventually, Harleysville scheduled the continuation of the Examination Under Oath for October 13, 2011.  The plaintiff proposed an alternate approach under which the plaintiff would not appear for the continuation of the Examination Under Oath until such time as her application in the criminal case for Accelerated Rehabilitation had been granted.  Counsel for Harleysville rejected the plaintiff's proposal, and notified the plaintiff on October 10 that the continuation of the Examination Under Oath scheduled for October 13, 2011 would proceed, and also demanded that 27 categories of documentation be brought on October 13, 2011 for inspection and copying.  He informed the plaintiff that failure by her to provide that documentation and complete her Examination Under Oath might constitute noncooperation under the Policy.

The plaintiff did not appear on October 13, 2011 for continuation of the Examination Under Oath.

On November 2, 2011, Taylor issued a denial of coverage letter stating that the plaintiff's noncooperation had been a breach of the provisions of the Policy and reserving all other bases for denying coverage. On November 21, 2011, the plaintiff's counsel responded, stating that the denial was improper because the plaintiff was in the process of gathering the requested information and would provide it as soon as she was able and that she was willing and ready to proceed with the continuation of the Examination Under Oath. However, no date for continuation of the Examination Under Oath was given.

On November 21, 2011, there was a proceeding in the plaintiff's criminal case, and the judge set the matter down for a judicial pretrial on December 9, 2011 and asked that Harleysville's attorney be present. The plaintiff's criminal defense attorney felt that, because of the way the prosecutor had explained the facts of the case to the judge, the judge was considering the case to be a more serious crime than would normally support an application for Accelerated Rehabilitation. The plaintiff was anxious to have an application for Accelerated Rehabilitation granted soon because she hoped it would be of help in getting her job back.

On January 4, 2012, the plaintiff's application for Accelerated Rehabilitation was granted. Explaining the facts to the judge, the state prosecutor said, _inter_ _alia_:

[PROSECUTOR]: Yes, Your Honor. This is a rather involved incident, the house fire on April 20, 2010, a subsequent arson investigation, which, I think, the appropriate context here is although no charges were ever brought, it was, at least, targeting the Defendant as a suspect in that investigation.

During the course of the investigation, it was determined that there were items missing, a generator, and a washer and dryer that were claimed as stolen from the residence by the Defendant and an insurance claim made on those paid out.

Essentially, the allegations are supportable as to those items that were claimed against the insurance. The false statement and insurance fraud certainly go to that. There was also a charge of Attempted Larceny First Degree. There was a claim made for the damage to the house in the amount of $240,000

Since there has been no proceeding, at least to this point, on the arson charge, it would appear that that is not an appropriate charge at this point.

(Def.'s Ex. TTT at p. 2, ll. 6-27.)

The state prosecutor also stated that there was a dispute as to what amount should be paid as restitution. Ruggerio was agreeable to restitution in the amount of $5,000, and Harleysville had been seeking $39,000 in restitution, representing the cost of its investigation. But counsel for Harleysville stated on January 4 that it would simply defer to the judge as to the appropriate amount of restitution.

The prosecutor's representation to the court that an insurance claim had been paid out on the washer, dryer and generator was, unfortunately, not accurate. The plaintiff's criminal defense attorney and the plaintiff both explained that the $5,000 check was an advance payment on the claim for the

fire, and was not given to the plaintiff on account on the items originally reported as stolen.  The plaintiff then explained that when she learned that her son-in-law had taken the washer, dryer and generator, she withdrew the claim, that the $5,000 was related to clothing and housing, not to the appliances, and that the plaintiff had informed the Clinton Police Department as soon as she found out that her son-in-law had taken the appliances. Harleysville's representative at the conference did nothing to correct the inaccuracy, although it is not apparent that, as the victim, Harleysville had any duty to do so.  But this inaccurate information may well have been material to the sentencing judge's assessment of the charges against the plaintiff.  As it was, the court seemed to not credit the explanation by the plaintiff and her counsel.  The plaintiff was ordered to pay $5,000 in restitution to Harleysville and complete 100 hours of community service during her first year of probation.

Additional findings of fact are set forth below in the related portions of the discussion.

II.     DISCUSSION

Based on the evidence submitted at trial the court has concluded that the requirements for amending the Amended Complaint to add the plaintiff's proposed additional claims are not satisfied here; that Harleysville was not negligent in terms

of how it investigated the loss or adjusted the loss; and that
Harleysville did not breach the insurance contract.

### A. Motion for Leave to Amend the Complaint

The plaintiff seeks leave to file a second amended
complaint to add claims for negligent and intentional infliction
of emotional distress and breach of the duty of good faith and
fair dealing.  Rule 15(b) relates to "Amendments During and
After Trial" and provides that:

> When an issue not raised in the pleadings is tried by the
> parties' express or implied consent, it must be treated in
> all respects as if raised in the pleadings.  A party may
> move —— at any time, even after judgment —— to amend the
> pleadings to conform them to the evidence and to raise an
> unpleaded issue.

Fed. R. Civ. P. 15(b)(2).  In light of the evidence introduced
at trial, the plaintiff's motion must be denied.  First, the
issues she raises were not tried by the parties' express or
implied consent.  Second, amending the pleadings by adding the
claims the plaintiff seeks to add would not conform the
pleadings to the evidence at trial.

As to the first point, "[e]xpress consent may be given by
stipulation, or may be incorporated in a pretrial order and
rarely raises any serious fact questions."  6A Charles Alan
Wright, et al., Fed. Prac. & Proc. Civ. § 1493 (3d ed. 2010).
Here, there is no such stipulation or pretrial order.  "Implied
consent, however, is much more difficult to establish as it

depends on whether the parties recognized that an issue not presented by the pleadings entered the case at trial." Id. Here, the history of the defendant's objections to the plaintiff's repeated attempts to amend her complaint and the evidence at trial establish that the defendant at no time recognized that any of these claims had entered the case at trial. The evidence at trial also establishes that adding the claims the plaintiff seeks to add would not conform the pleadings to the evidence at trial.

After removing this case from state court, Harleysville filed a motion to dismiss the counts in the complaint setting forth claims for breach of the duty of good faith and fair dealing, for violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Sta. § 38a-815, et seq., and for violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq..  In response, the plaintiff withdrew those counts and filed the Amended Complaint, which contains only the two current claims, negligence and breach of contract.

The parties conducted extensive discovery based on these two claims, and Harleysville filed a motion for summary judgment.  While the motion for summary judgment was pending, the plaintiff retained new counsel.  Approximately four months after new counsel entered her appearance, the court issued an

order denying the motion for summary judgment.  The court then issued the trial memorandum order.  Then, the plaintiff filed motions to modify the scheduling order, amend the complaint, and reopen discovery, which were opposed by the defendant.  The court denied the plaintiff's motions to the extent they were pursuant to Rule 15(a) because it would have been unfairly prejudicial to Harleysville to add back--after discovery had concluded, a motion for summary judgment had been filed and ruled on, and the trial memorandum order had been issued--claims that Harleysville properly believed were no longer at issue and thus did not consider in defending the case.  The court observed that, while the decision to withdraw these counts from the original complaint was made by the plaintiff's former counsel and not her current counsel, disagreement with prior counsel's litigation strategy was not sufficient to justify the amendment at that stage of the case.

The plaintiff also argued that the emotional distress claims were alleged generally in the original complaint even though they had not set forth specifically in counts.  But the court concluded that such general allegations were not sufficient to support a motion seeking to add new causes of action because the parties had already conducted extensive discovery based on the claims that were in the Amended Complaint

and briefed the motion for summary judgment based only on those claims.

The defendant also opposed the motion for leave to file a second amended complaint that was the subject of the discussion during the final pretrial conference.

A review of the elements of the causes of action for the three claims the plaintiff seeks to add and the pertinent portions of the evidence at trial shows that these issues were not tried by the parties' implied consent and that adding these claims would not conform the pleadings to the evidence at trial.

To establish a claim for negligent infliction of emotional distress, a plaintiff must show that:

> (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.

Hall v. Bergman, 296 Conn. 169, 182 n.8 (2010) (quoting Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (2003)).

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show "(1) the defendant intended or knew that the emotional distress would likely result from its conduct; (2) the defendant's conduct was outrageous and extreme; (3) the defendant's conduct caused plaintiff distress; and (4) plaintiff's distress was severe." Menon v. Frinton, 170

F. Supp. 2d. 190, 198 (D. Conn. 2001) (citing <u>Petyan v. Ellis</u>,

200 Conn. 243, 253 (1986)).  "[O]nly where the conduct has been

so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community will

the second prong . . . satisfied."  <u>Ormond v. Hosp. of St.

Raphael</u>, No. 3:08-CV-00214 (JCH),2009 WL 4730751, at * 2 (D.

Conn. Dec. 4, 2009).

Connecticut "recognizes a common-law duty of good faith and

fair dealing between an insurer and its insured."  <u>Carford v.

Empire Fire & Marine Ins. Co.</u>, 94 Conn. App. 41, 46 (2006).

> To constitute a breach of [the implied covenant of good
> faith and fair dealing], the acts by which a defendant
> allegedly impedes the plaintiff's right to receive benefits
> that he or she reasonably expected to receive under the
> contract must have been taken in bad faith. Bad faith in
> general implies both actual or constructive fraud, or a
> design to mislead or deceive another, or a neglect or
> refusal to fulfill some duty or some contractual
> obligation, not prompted by an honest mistake as to one's
> rights or duties, but by some interested or sinister motive
> . . . .  Bad faith means more than mere negligence; it
> involves a dishonest purpose.

<u>De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.</u>, 269 Conn.

424, 432-33 (2004) (citations and quotation marks omitted).  "In

the insurance context, bad faith arises only when an insurer

acts without a reasonable basis."  <u>Fleming v. Gov't Employees

Ins. Co.</u>, 86 F. Supp. 3d 102, 109 (D. Conn. 2015) (citations and

quotation marks omitted)

> [A] mere coverage dispute or negligence by an insurer in
> conducting an investigation," <u>Martin v. Am. Equity Ins.</u>
> <u>Co.</u>, 185 F. Supp. 2d 162, 165 (D. Conn. 2002), is not
> sufficient to state a claim of bad faith against an
> insurer.

<u>Emmelmann v. Am. & Foreign Ins. Co.</u>, No. 3:03CV02144 (AWT), 2006
WL 861015, at *2 (D. Conn. Mar. 31, 2006).

With respect to the issue of the plaintiff being caused to
suffer emotional distress, no inference with respect to implied
consent can be drawn from the fact that the plaintiff's
emotional distress was addressed at trial.  This is because the
defendant moved for judgment on the pleadings with respect to
the negligence claim, contending that the claim was precluded by
the economic loss doctrine and the court denied that motion
because the plaintiff had made it clear with respect to her
negligence claim that in addition to her economic losses, she
was seeking to recover for emotional distress.  (See discussion
in Part II.B.)

Here, adding the claims for negligent and intentional
infliction of emotional distress would not conform the pleadings
to the evidence because the plaintiff has not produced evidence
that establishes that Harleysville's conduct was the cause of
the plaintiff's emotional distress, which is the fourth element
of a claim for negligent infliction of emotional distress and
the third element of a claim for intentional infliction of
emotional distress.

The plaintiff testified that she believes that Susan D'Agostino pressured her family members and relatives into making false statements to the Clinton Police Department and that as a result the plaintiff was publicly humiliated and was also humiliated by losing a good paying job. When discussing this point, she stated "Absolutely. Do you know how embarrassing that was?" (Trial Tr. p. 118, l. 10.) The plaintiff also testified that she believes that Sgt. Flynn filed false arrest warrants and fraudulently altered witness statements implicating her in the arson.

Kat Ruggerio testified that lies she, i.e. Kat, told the police contributed to the plaintiff being arrested and that the arrest has had an adverse impact on the plaintiff's life. Kat Ruggerio never attributed any part of the plaintiff's emotional distress to any act on the part of Harleysville. Kenneth Ruggerio, Jr. testified about the fact that there was a lot of publicity in the newspaper about the plaintiff being arrested and that the plaintiff lost her job as a result of the arrest, but he never claimed that his mother's emotional distress was attributable to any conduct on the part of Harleysville. Moreover, the plaintiff's other daughter, Shirley Hally testified that, not only the plaintiff, but the plaintiff's whole family is stressed out from what has happened to the plaintiff and that the people who caused that stress are the

D'Agostinos and Sgt. Flynn--in particular Susan D'Agostino because she "set up" the plaintiff and Sgt. Flynn because there was no evidence against the plaintiff to justify the arrest and prosecution.  Finally, it is also apparent that the shifting versions of events the plaintiff gave with respect to the washer, dryer and generator damaged her credibility with both the Clinton Police Department and Harleysville.

In addition, the plaintiff has not produced evidence that establishes the second element of a claim for intentional infliction of emotional distress, i.e. that the defendant's conduct was extreme and outrageous.  The conduct that Harleysville actually engaged in, as opposed to the allegations the plaintiff seeks to add, as discussed next in connection with the proposed claim for breach of the implied covenant of good faith and fair dealing, falls well short of meeting the standard for extreme and outrageous conduct.

Amending the complaint to add a claim for breach of the implied covenant of good faith and fair dealing would not conform the pleadings to the evidence at trial because the plaintiff has not established that Harleysville acted without a reasonable basis.  The plaintiff seeks to add in support of this claim allegations, set forth in the proposed second amended complaint, that (i) Harleysville worked in conjunction with the Clinton Police Department to engineer the plaintiff's arrest on

false felony charges; (ii) Harleysville manufactured a "paper trial" to make it appear that the plaintiff was not cooperating with Harleysville's investigation, when in fact the plaintiff provided all requested documentation, gave numerous statements to adjusters and appeared several times for her Examination Under Oath; (iii) Harleysville actively worked with the prosecutor in pressing false felony charges against the plaintiff, and (iv) Harleysville opposed the plaintiff's request for Accelerated Rehabilitation.

Connecticut General Statutes § 38a-988 provides, in part, that

> an insurance institution, agent or insurance-support organization shall not disclose any personal or privileged information concerning an individual collected or received in connection with an insurance transaction unless disclosure is:
>
> * * *
>
> (6)Made to a law enforcement or other governmental authority: (A) To protect the interests of the insurance institution, agent or insurance—support organization in preventing or prosecuting the perpetration of a fraud upon it; or (B) if the institution, agent or organization reasonably believes that illegal activities have been conducted by the individual.

Conn. Gen. Stat. § 38a-988. Thus, Section 38a-988 authorizes an insurance company to disclose information concerning its insured to legal authorities when it is seeking to prevent or prosecute the perpetration of a fraud upon the carrier, or if the insurer reasonably believes that illegal activities have occurred.

Here, the evidence established that Harleysville genuinely believed that the plaintiff was somehow involved in the arson at the Property.  The evidence does not establish, or even suggest, that Harleysville worked with the Clinton Police Department to engineer the plaintiff's arrest on false felony charges; manufactured evidence to make it appear that the plaintiff was not cooperating with its investigation; actively worked with the prosecutor to press felony charges against the plaintiff that it believed to be false; or opposed the plaintiff's request for an Accelerated Rehabilitation.  The Clinton Police Department initiated contact with Harleysville.  Harleysville was soon thereafter presented with evidence suggesting that the plaintiff was involved in the arson at the Property.  As the victim, Harleysville inquired about the progress of the investigation and was informed about the progress of the investigation by the investigating officer.  The prosecutor reached out to Harleysville to find out its views, as the victim, concerning the disposition of the criminal case, and while Harleysville expressed its views as the victim and asked for more in restitution than the plaintiff was agreeable to, it did not oppose the plaintiff receiving Accelerated Rehabilitation on January 4, 2012 —— although that would seem to be one of a victim's rights.  Finally, as discussed below, the evidence

establishes that, in fact, the plaintiff did not cooperate with Harleysville's investigation.

In light of the foregoing, the plaintiff has not established either that the issues she raises were tried by the parties' express or implied consent or that amending the pleadings would conform them to the evidence at trail.

### B. First Count — Negligence

The plaintiff claims that Harleysville was negligent and careless by failing to properly investigate the loss and by failing to properly adjust the loss.

At an earlier stage of this case, Harleysville moved for judgment on the pleadings with respect to the plaintiff's claim for negligence. Harleysville argued that the claim is precluded by the economic loss doctrine. In Aliki Foods, LLC v. Otter Valley Foods, Inc., 726 F. Supp. 2d 159 (D. Conn. 2010), the court observed that "[t]he economic loss doctrine is a judicially created doctrine which bars recovery in tort where the relationship between the parties is contractual and the only losses alleged are economic." Id. at 164 (citations omitted). The court quoted, inter alia, Princess Cruises, Inc. v. Gen. Elec. Co., 950 F. Supp. 151, 156 (E.D. Va. 1996), for the proposition that "to permit a party to a broken contract to proceed in tort where only economic losses are alleged would eviscerate the most cherished virtue of contract law, the power

of the parties to allocate the risks of their own transactions."
Aliki Foods, 726 F. Supp. 2d at 165 (internal brackets omitted).

Thus, two conditions must be satisfied for the economic
loss doctrine to be applicable: first, there must be a
contractual relationship between the parties, and second, the
only losses alleged are economic.  The court denied
Harleysville's motion for judgment on the pleadings because it
concluded that paragraph 15 in the First Count of the Amended
Complaint made it clear that, in addition to economic losses,
the plaintiff is seeking to recover for emotional distress.
However, for the reasons discussed above the plaintiff has not
established any causal connection between conduct on the part of
Harleysville and emotional distress suffered by the plaintiff.
Thus, the plaintiff's negligence claim is precluded by the
economic loss doctrine.

In addition, Harlesyville is entitled to judgment on the
merits with respect to this claim.  "The essential elements of a
cause of action in negligence are well established: duty; breach
of that duty; causation; and actual injury. . . ."  Murdock v.
Croughwell, 268 Conn. 559, 566 (2004) (internal quotation marks
omitted).

During the trial the plaintiff asserted that once
Harleysville learned the names of the four individuals who were
reported to have witnessed, together with Susan D'Agostino, the

plaintiff offer to pay money to have the Property burned, Harleysville's failure to interview those people was unreasonable. On its face, though, a decision by Harleysville not to interview these witnesses while a criminal investigation was still being conducted seems like a reasonable decision. In any event, the plaintiff has offered no evidence to establish that Harleysville's decision not to interview these four witnesses was contrary to some industry standard of care with respect to insurance investigations or adjustments, which would be required to show that Harleysville owed such a duty to the plaintiff.

Other than asserting that Harleysville acted in bad faith in handling the plaintiff's claim, the plaintiff's proposed findings and conclusions of law (See Pl.'s Post-Trial Brief with Proposed Findings and Conclusions of Law (Doc. No. 256)) does not identify any additional specific negligent acts. To the extent the plaintiff intends to incorporate its arguments that (i) Harleysville worked in conjunction with the Clinton Police Department to engineer the plaintiff's arrest on false felony charges; (ii) Harleysville manufactured a "paper trial" to make it appear that the plaintiff was not cooperating with Harleysville's investigation when in fact the plaintiff provided all requested documentation, gave numerous statements to adjusters and appeared several times for her Examination Under

Oath; (iii) Harleysville actively worked with the prosecutor in pressing false felony charges against the plaintiff; and (iv) Harleysville opposed the plaintiff's request for Accelerated Rehabilitation, the plaintiff has, as discussed above, failed to establish that Harleysville engaged in any such conduct.

Representatives of Harleysville testified that Harleysville followed its usual and customary methods and processes in investigating and adjusting the plaintiff's loss. They also testified that those usual and customary methods and processes were in accord with their understanding of insurance industry practices. The plaintiff has produced no persuasive evidence to the contrary.

Based on the foregoing, the court concludes that the plaintiff has failed to establish that Harleysville was negligent in either investigating or adjusting the plaintiff's loss.

### C. Second Count — Breach of Contract

It is undisputed that Harleysville refused to pay the plaintiff's claim in connection with the fire at the Property, but Harleysville contends that it had no obligation to do so because the plaintiff breached the Policy, rendering it void.

The court finds that the plaintiff breached the Policy by failing to appear for the continuation of her Examination Under Oath, by failing to produce material portions of the records and

documents requested by Harleysville, and by making material misrepresentations concerning whether she resided at the Property.

"Generally, in the absence of reasonable excuse, when an insured fails to comply with the insurance policy provisions requiring an examination under oath and the production of documents, the breach generally results in the forfeiture of coverage, thereby relieving the insurer of its liability to pay, and provides the insurer an absolute defense to an action on the policy." Double G.G. Leasing. LLC v. Underwriters at Lloyd's, London, 116 Conn. App. 417, 432 (2009) (citation and internal quotation marks omitted).

The Examination Under Oath began on March 2, 2011. It was not completed that day, however, because the plaintiff's attorney had another appointment. The examination was adjourned with the express understanding that Harleysville could continue the examination. Also, it was clear that the plaintiff had not provided Harleysville with all of the records and documents that had previously been requested by Harleysville.

"The right to examination . . . is material because it is part of a bargained-for discovery process that *may lead* to the discovery of information barring recovery under a policy because a claim is based on fraud and criminal activity." Bergen v. Standard Fire Ins. Co., No. CV 93044099S, 1997 WL 809957, at *7

(Conn. Superior Ct. Dec. 31, 1997). See also Taricani v.
Nationwide Mut. Ins. Co., 77 Conn. App. 139, 147 (2003) ("as a
matter of law, the plaintiffs' failure to appear to be examined
under oath was a breach of a material condition in their
business property insurance policy"); Capello v. Aetna Life &
Cas. Co., No. CV92-0510478 S, 1993 WL 119691, at *1 (Conn.
Superior Ct. April 5, 1993) (granting summary judgment "on the
ground that the plaintiff failed to meet his contractual
obligation of submitting to an examination under oath as
required in a fire insurance policy").

It is understandable that the plaintiff was concerned
about continuing with the Examination Under Oath once she
learned that, at the time she sat for the beginning of the
Examination Under Oath on March 2, 2011, there had been a
warrant outstanding for her arrest on charges of attempted
larceny, insurance fraud and making a false statement.  The
plaintiff had the right to assert her Fifth Amendment privilege
with respect to specific questions, as she appeared to do on
March 2, 2011 when she refused to answer a question after being
advised by her attorney not to do so.  (See Pl.'s Ex. 8 p. 103,
ll. 2-4.)  But she did not have a right to simply refuse to
appear for continuation of the examination by asserting her
Fifth Amendment privilege.  Doing so deprived Harleysville of
the benefit of the adverse inferences that could have properly

been drawn based on her asserting the privilege with respect to specific questions. <u>See</u> <u>Louis Vuitton Malletier S.A. v. LY USA, Inc.</u>, 676 F.3d 83, 97-98 (2d Cir. 2012) ("A defendant in a civil proceeding who invokes the Fifth Amendment as a result of an overlapping criminal investigation or proceeding 'risk[s] the adverse inference arising from [his or her] assertion of the privilege.'") (alterations in the original) (citation omitted).

Also, the plaintiff did not satisfy the requirement that she submit to the Examination Under Oath by virtue of her appearance on March 2, 2011.

> It has also been held that there is a bar to recovery where an insured stayed for only part of the examination and left, *AMCO Mutual Insurance Co. v. Lamphere,* 541 N.W. 2d 910, 914 (Iowa, 1995), and that failure to submit to a second examination as agreed upon at the close of the first examination constitutes a failure by the insured to comply with contractual obligations. *Catalogue Service of Westchester, Inc. v. Insurance Company of North America,* 74 A.D.2d 837, 425 N.Y.S. 2d 635, 637 (1980).

<u>Bergen v. Standard Fire Ins. Co.</u>, No. CV 93044099S, 1997 WL 809957, at *4 (Conn. Superior Ct. Dec. 31, 1997). Thus, Harleysville has established that the plaintiff failed to submit to the Examination Under Oath as required by the Policy.

Harleysville has also established that although the plaintiff produced some records and documents in response to Harleysville's request pursuant to the Policy, material portions of those records and documents were not produced. When counsel for Harleysville wrote to the plaintiff's counsel on May 5,

2011, i.e. over three months after the commencement of the
Examination Under Oath, the defendant's counsel identified
records and documents that remained outstanding:

> Harleysville wishes to move forward with Ms. Ruggiero's
> continued Examination as soon as possible, however, as you
> are aware, many supporting claim documents remain
> outstanding. These requests included any additional
> documents evidencing Ms. Ruggiero's income and/or
> indebtedness between January 1, 2007 and present time
> (document requests nos. (6) and (7)); documentation
> supporting the amount claimed for the loss, as well as
> ownership of the property claimed (document request no
> (8)); federal, state and local tax returns for years 2007-
> 2010 (document request (9)); all mortgage and refinancing
> agreements, as well as payoff figures and balance
> statements for any such mortgage(s) (document requests nos.
> (10) and (17); utility records pertaining to the subject
> property for January 1, 2008 through present (document
> request no. (15)).

(Pl.'s Ex.28). These records and documents were material.

Subsequent letters from counsel for Harleysville, including
the October 10, 2011 letter, reiterated Harleysville's request
for records and documents. The denial of coverage letter was
issued on November 2, 2011, and the plaintiff's counsel wrote to
counsel for Harleysville on November 21, 2011 stating that the
plaintiff was in the process of gathering the requested
information and would provide it as soon as she was able. Thus,
the court finds that the plaintiff did not comply with her
obligation under the Policy to provide Harleysville with the
records and documents it requested.

The parties disagree about whether Harleysville has the
burden of proof with respect to showing that it was prejudiced
by the plaintiff's noncompliance with her obligations to submit
to an Examination Under Oath and provide Harleysville with the
records and documents it requested.  They advance different
interpretations of the effect of the holdings in Arrowood Indem.
Co. v. King, 304 Conn. 179 (2012), Taricani, 77 Conn. App. 139,
Aetna Cas. & Sur. Co. v. Murphy, 206 Conn. 409 (Conn. 1988), and
Brown v. Employer's Reinsurance Corp., 206 Conn. 668 (1988).
The court need not resolve that issue here because Harleysville
has established that it was prejudiced by the plaintiff's
refusal to cooperate.

Harleysville is convinced that the plaintiff was involved
in the arson at the Property.  However, the court concludes
that, although there is credible evidence to support
Harleysville's position, it has not established that the
plaintiff was involved.  Determining who was actually involved
in the arson is complicated here inordinately by the fact that a
number of people who have testified (including at deposition) or
given statements have been untruthful as to material matters,
and/or have given vague, confusing or unclear statements, and/or
subsequently asserted that prior statements by them were not
truthful.  The web of complicated personalities and
relationships associated with the plaintiff is worthy of a soap

opera, and the plaintiff was the key witness, or at least a key witness, who needed to be pinned down with respect to her version of a number of events.  So it was particularly important that Harleysville be able to promptly subject the plaintiff to a thorough examination and have the benefit to as much information in the form of records and documents as existed at the time it did so.  See Laine v. Allstate Ins. Co., 355 F. Supp. 2d 1303 (N.D. Fla. 2005) ("the whole point of the examination under oath requirement is to afford the insurer an opportunity to investigate whether or not the insured was and is telling the truth.")  Also, the plaintiff's failure to cooperate deprived Harleysville of the opportunity to timely identify other individuals who were potentially significant witnesses and interview those individuals at a point close in time to when the events occurred, as well as timely identify other documents that were potentially important to its investigation.  In addition, during the period that the plaintiff was refusing to continue with her Examination Under Oath, she brought suit against Harleysville claiming, inter alia, that it had not properly investigated the loss, while she was impeding its investigation.

Thus, the court concludes that Harleysville has established that the plaintiff breached the Policy by failing to submit to the Examination Under Oath and by failing to provide Harleysville with records and documents it requested.

Harleysville has also established that the plaintiff breached the Policy by making material misrepresentations to Harleysville concerning whether she was residing at the Property at the time of the fire.

> [An insurance company] must prove only that the insured wilfully concealed or misrepresented a material fact with the intention of deceiving the insurer. Unlike a party asserting a cause of action for common law fraud, an insurer who raises the special defense of concealment or misrepresentation does not have to prove that the insurer actually relied on the concealment or misrepresentation or that the insurer suffered injury. . . . [I]n the case of an insurance contract, the consequence of the alleged concealment or misrepresentation is the forfeiture of a contractual benefit, and therefore the burden of proof normally applicable to contractual claims, the preponderance of the evidence standard, should control.

Rego v. Conn. Ins. Placement Facility, 219 Conn. 339, 346-47 (1991) (citations omitted).

The plaintiff testified during the Examination Under Oath that she was living at the Property. She specifically denied that she was living at 349 Laurel Street, describing it as simply being "a place to go to." (Pl.'s Ex. 8 p. 25, l. 23.) However, the plaintiff's testimony on this point is directly contradicted by detailed testimony from each of her three children. Kenneth Ruggerio, Jr. testified that his mother moved out of the house in October 2009 after his father passed away in September 2009, and that the Property was vacant after his sister Kat Ruggerio moved out in February 2010. After that time he thought that there might be squatters there.

Kat Ruggerio gave similar testimony. She had told the police that the house was vacant after she moved out in February 2010. When the court asked her what she meant by "vacant" she stated that she meant that "nobody lives there". (Trial Tr. p. 217, l. 12.)

The plaintiff's other daughter, Shirley Hally, also testified that no one was living at the Property after Kat and her husband Anthony D'Agostino moved out in February 2010, and that Shirley also thought there may have been squatters there. She testified that when she went to the Property she specifically checked to see if there were signs that squatters were living in the house.

Finally, in her statement to the Clinton Police Department shortly after the fire, the plaintiff stated "I am the residen[t] at 52 Airline Rd. in Clinton. I have owned the residence since Nov. 1996. I have live[d] here with my family from that time up until Oct. 2009." (Def.'s Ex. R.)

Thus, the court concludes that Harleysville has established that the plaintiff breached the Policy by making material misrepresentations to Harleysville concerning whether she was residing at the Property at the time of the fire.

Based on the foregoing the court concludes that Harleysville is entitled to judgment on the plaintiff's claim for breach of contract.

III.     **CONCLUSION**

For the reasons set forth above, the court concludes that judgment should enter in favor of defendant Harleysville Preferred Insurance Company on all of the plaintiff's claims in the Amended Complaint.

The Clerk shall enter judgment accordingly and close this case.

It is so ordered.

Signed this 30th day of September 2017, at Hartford, Connecticut.


            /s/AWT
           Alvin W. Thompson
         United States District Judge